IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 8, 2022 Session

IN RE YANCY N.

Appeal from the Juvenile Court for Coffee County
No. 2020-JV-276    John P. Damron, Judge

_____

No. M2021-00574-COA-R3-PT

_____

A father appeals the termination of his parental rights to one of his children.  The juvenile court concluded that there was clear and convincing evidence of seven statutory grounds for termination.  The court also concluded that there was clear and convincing evidence that termination was in the child's best interest.  After a thorough review, we agree and affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Peter Trenchi, III, Sewanee, Tennessee, for the appellant, Scot N.

Herbert H. Slatery III, Attorney General and Reporter, and Courtney J. Mohan, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Jean M. Brock, McMinnville, Tennessee, Guardian ad Litem.

OPINION

I.

A.

After Yancy N.'s birth in November 2014, the Tennessee Department of Children's Services received referrals claiming the child was at risk.  But it was another fifteen months before DCS petitioned the juvenile court for temporary custody and to adjudicate the child dependent and neglected.  DCS found the child in the home of his paternal grandparents.

His parents, Scot N. ("Father") and Amanda H. ("Mother"), lived in a camper on the property. Father consented to a drug screen and tested positive for benzodiazepines, methamphetamine, opiates, and tetrahydrocannabinol ("THC"). He denied using drugs in the past two months. And he suggested that Mother was "sneaky" and may have put drugs in his food. Father claimed that he had been to rehab twice in the last year and had reduced his alcohol consumption from a gallon of whiskey a day to forty ounces of beer a day.

Mother was not present when the child was removed. Father explained that she left the home because he refused to buy her drugs. He also claimed that Mother had used drugs the night before. DCS interviewed Mother the next day. She acknowledged an altercation with Father. And her drug screen was positive for methamphetamine and showed traces of amphetamine and THC. Like Father, she denied using methamphetamine, but she suggested that Father could have spiked her food with drugs.

Neither Father nor Mother appeared for the adjudicatory hearing on DCS's petition. After the hearing, the court concluded there was clear and convincing evidence that the child was dependent and neglected. And the court ordered the child to remain in the temporary custody of DCS. DCS placed Yancy with a foster family.

Thereafter, DCS worked with the parents to complete the requirements of a family permanency plan. The plan's goals were to either return Yancy to a parent or to place the child with a relative.

Over a year and a half after the child's removal, the court entered a final order returning custody of Yancy to Mother. By that point, Mother and Father were no longer together. In its order, the court found that Mother had successfully completed a ninety-day trial home placement and had substantially complied with the terms of the permanency plan. As for Father, the court ordered that he have no visitation with the child due to his lack of compliance with the permanency plan's obligations.

In 2019, less than two years after Mother regained custody, DCS filed a second dependency and neglect petition. Mother had resumed her drug use, and Father was dealing with mental health issues. Father would later testify that he was also using methamphetamine daily during that period. The parents again failed to appear at the adjudicatory hearing, and the court found that Yancy was once again dependent and neglected.

DCS placed Yancy with an aunt and uncle but was soon forced to move him, in part due to harassment by Father. DCS then placed the child with the same foster family who cared for him following the first removal.

In November 2019, the court ratified a new family permanency plan. The responsibilities for Father under the new plan largely mirrored those of the first plan. Again, Father failed to make meaningful progress on the plan's requirements. He also

2

found himself in frequent legal trouble. Father was incarcerated from November 5 to December 19, 2019; February 5 to April 22, 2020; and July 27, 2020 to March 1, 2021.

B.

On August 6, 2020, DCS petitioned the juvenile court to terminate Mother's and Father's parental rights. As to Father, DCS alleged seven statutory grounds for termination: abandonment by failure to visit; abandonment by failure to support; abandonment by wanton disregard; abandonment by failure to provide a suitable home; substantial non-compliance with the permanency plan; persistent conditions; and failure to manifest an ability and willingness to assume custody. *See* Tenn. Code. Ann. § 36-1-113(g) (Supp. 2020).

The court heard testimony about DCS's efforts to return Yancy to his parents. The child's current Family Service Worker ("FSW") told the court that Father had done little to comply with the most recent permanency plan. She explained that Father was difficult to reach when not incarcerated, continued to test positive for illegal drugs, and did not have steady employment. When not incarcerated, Father did complete an assessment for entry into family treatment court but was ultimately unable to enroll due to an outstanding warrant and ensuing incarceration. He never followed up with the program after that.

Father's residence was also deemed inappropriate by DCS. Father lived at the same address as his parents. At one point, he was living in a detached garage rather than inside the home. According to Father, he did so only because Mother hated Father's mother. Father claimed that he was now living inside the home. Father's parents were both elderly and dealing with health issues.

In his testimony, Father acknowledged his past failings but attributed most of them to his relationship with Mother. While admitting to mental health and substance abuse issues, he insisted he was willing and able to care for Yancy if given some time to "get back on [his] feet first." He needed time because he did not have a job, transportation, or a driver's license. He was released from jail only eleven days before the start of the trial.

Father told the court that he and the child shared a bond and enjoyed activities like cooking together, tearing apart and repairing various items, and spending time outdoors. When asked how the two could engage in such activities when Father was not permitted visitation following the first removal, Father asserted his Fifth Amendment right against self-incrimination.

The juvenile court terminated the parental rights of both Father and Mother. As to Father, it concluded there was clear and convincing evidence of all seven grounds for termination. It also concluded that the evidence was clear and convincing that termination of Father's parental rights was in the best interest of Yancy.

3

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 2020). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

Only Father has appealed. He challenges both the grounds for terminating his parental rights and the determination that termination was in the child's best interest.

1. Abandonment by Incarcerated Parent

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). There are "alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (Supp. 2020)[1] (defining the term "abandonment"). One definition, found at Tennessee Code Annotated § 36-1-102(1)(A)(iv), applies where a parent, like Father, was incarcerated or had been incarcerated within the four-month period before the termination petition was filed.

An incarcerated or previously incarcerated parent can be deemed to have abandoned a child in several ways. Such a parent abandons his child by either failing to visit or failing to support the child "during an aggregation of the first one hundred (120) days of non-incarceration immediately preceding the filing of the action." Tenn. Code Ann. § 36-1-102(1)(A)(iv)(b). For Father, this period ran from January 12 to February 5, 2020 (24 days) and from April 22 to July 27, 2020 (96 days).[2] An incarcerated or previously incarcerated parent is also deemed to have abandoned a child by "engag[ing] in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." *Id.* § 36-1-102(1)(A)(iv)(c). Here, the juvenile court concluded that each of these grounds of "abandonment" applied to Father.

a. Failure to Visit

We conclude that that the evidence is clear and convincing that Father abandoned his child by failing to visit. "Whether a parent failed to visit . . . a child is a question of fact." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013). Although a court order from October 2017 prohibited Father from visiting, at no time after that order did Father take any steps to regain his visitation rights. *See id.* at 642 (recognizing an order

---

[1] In 2020 and 2021, the Legislature amended the statutory definition of "abandonment." 2020 Tenn. Pub. Acts 43 (ch. 525); 2021 Tenn. Pub. Acts 828 (ch. 311). We apply the version of the statute in effect at the time DCS filed its petition to terminate. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017). So we cite to the version of Tennessee Code Annotated § 36-1-102 effective after the 2020 amendment but prior to the 2021 amendment.

[2] The court determined that the relevant period began on January 11, 2020 instead of January 12, 2020. But, because the court's findings include the correct time period, this error is harmless. *See In re Savanna C.*, No. E2016-01703-COA-R3-PT, 2017 WL 3833710, at *9 (Tenn. Ct. App. Aug. 31, 2017).

suspending a parent's visitation rights does not preclude a finding of abandonment by failure to visit).

Father argues that his various incarcerations precluded visitation. But in examining this ground, we only look at time periods when Father was not incarcerated.

### b. Failure to Support

We also conclude that the evidence is clear and convincing that Father abandoned his child by failing to make reasonable payments toward his support. "Failed to support" or "failed to make reasonable payments toward such child support" is statutorily defined as "failure . . . to provide monetary support or the failure to provide more than token payments towards the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). "Token support" is where "the support, under the circumstances of the individual case, is insignificant given the parent's means." *Id.* § 36-1-102(1)(B).

The juvenile court found that Father only made a single fifty-dollar support payment in July 2020.[3] We agree with the court that this payment amounted to token support under the circumstances. The court found that Father, when not incarcerated, "possesse[d] significant skills in construction and earthwork trades and [wa]s capable of earning a substantial wage." The court also found that, during the applicable time period, Father "was residing in the home of his parents and . . . pa[id] a minimal contribution as a share of the household expense."

### c. Wanton Disregard

The evidence is likewise clear and convincing that Father abandoned his child by "engag[ing] in conduct prior to [his] incarceration that exhibit[ed] a wanton disregard for the welfare of the child." *Id.* § 36-1-102(1)(A)(iv)(c). "Wanton disregard" is not a defined term. Commonly, actions amounting to "wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). Such actions may include, either alone or in combination, "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child." *In re Audrey S.*, 182 S.W.3d at 867-68. But, ultimately, the question is "whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* at 866.

---

[3] DCS argues that this payment should not count because it was received two days outside the applicable time period. But the court considered the payment as if it were made during the applicable period.

Here, the record establishes such a pattern of conduct. Since Yancy's birth, Father was incarcerated eight separate times. He was released from incarceration only eleven days before trial. His criminal history during Yancy's life is extensive and includes felony child abuse where Yancy was the victim, numerous probation violations, driving under the influence, and missed or failed drug screens.

When not incarcerated, Father failed to act in the child's interest. When Yancy was returned to Mother's custody in 2017, Father was denied visitation due to his failure to comply with the first permanency plan. He never sought to modify the visitation restriction. Instead, Father continued his criminal behavior and drug use and failed to provide support for Yancy other than one payment of fifty dollars.

2. Abandonment by Failure to Provide a Suitable Home

Yet another definition of "abandonment" considers whether a child has a suitable home to return to after the child's court-ordered removal from the parent. Tenn. Code Ann. § 36-1-102(1)(A)(ii). Under Tennessee Code Annotated § 36-1-102(1)(A)(ii), termination of parental rights may be appropriate if:

(a) The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of [DCS] . . .;

(b) The juvenile court found . . . that [DCS] . . . made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, [DCS] . . . made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

*Id.*

A "suitable home" means something "more than a proper physical living location." *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007). A suitable home requires

7

"[a]ppropriate care and attention . . . to the child." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016).

We conclude that the evidence clearly and convincingly supports abandonment by failure to provide a suitable home. DCS removed Yancy from Father's physical and legal custody in 2016. At that point, the juvenile court found that DCS had made reasonable efforts to prevent the child's removal. And when the case closed, Father was ordered not to visit until his showed some compliance with the family permanency plan. From then on, Father never sought to lift that prohibition.

DCS made reasonable effort to assist Father in establishing a suitable home. Among other things, DCS met with Father to review and discuss the permanency plan. It provided Father with information about available mental health and substance abuse treatment services. And DCS visited the home of Father's parents to explore its potential as a home for Yancy.

Father failed to make reciprocal efforts. Aside from completing his latest period of incarceration just prior to trial, Father made little meaningful progress in any of the permanency plans' other areas of emphasis. At trial Father conceded as much. He testified that he was not yet able to care for the child and still needed time to "get back on [his] feet." He lived with his elderly parents. Although he claimed that he was living inside the home, when DCS visited the home, Father was still living in the garage. The proof showed it was unlikely that Father would have a suitable home for his child in the near future.

3. Substantial Noncompliance

Another ground for termination is "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the court must find the requirements that the parent allegedly failed to satisfy were "reasonable and [we]re related to remedying the conditions that necessitate foster care placement." *Id.* § 37-2-403(a)(C) (Supp. 2020). Permanency plan requirements may focus on remedying "conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

We agree with the juvenile court that the permanency plan requirements were reasonable and related to the conditions that necessitated foster care. Yancy first entered foster care due to Mother's and Father's substance abuse issues and Father's criminal behavior. To address these issues, the first permanency plan required Father to submit to random drug screens, comply with the terms of his probation, provide proof of stable housing and income, complete a drug and mental health assessment, learn parenting skills, and complete anger management treatment. After Yancy's second removal by DCS, a second permanency plan was ratified that contained substantially the same responsibilities

8

for Father. The requirements of the plans were appropriate given the reasons for Yancy's removal.

Next, we must determine whether the parent's noncompliance was substantial in light of the importance of the requirements to the overall plan. *See id.* at 548-49. "Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *Id.* at 548. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.,* No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). We review the court's findings of fact concerning compliance with the requirements of the permanency plan de novo with a presumption of correctness. *See In re Valentine,* 79 S.W.3d at 547.

We conclude that the evidence is clear and convincing that Father failed to substantially comply with the requirements of the permanency plans. In the almost five years between Yancy's initial removal and the trial, Father made little effort to comply with the plans' requirements. When not incarcerated, he did not complete the drug and mental health assessments. Father also did not comply with the terms of his probation and failed or missed drug screens. Father also failed to seek out employment, attend anger management treatment, or work on a stable home for Yancy.

4. Persistence of Conditions

The juvenile court also found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. The ground of persistence of conditions focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. So the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. Persistence of conditions may be a basis to terminate parental rights when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . ., or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . .;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

At the time of trial, Yancy had been removed from Father's custody for more than six months. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B) (providing "[t]he six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard"). And this record contains clear and convincing evidence that the conditions preventing Yancy's safe return remain. Father still lived with his parents, did not have employment, and had not received treatment for his mental health and substance abuse issues.

We also conclude that the evidence is clear and convincing that there was little likelihood that these conditions would be remedied in the near future. Father testified that his issues stemmed from his relationship with Mother, but his actions reflect otherwise. Even after separating from Mother and when not incarcerated, Father took minimal steps to comply with the requirements of the permanency plan. And he knew complying with the permanency plan was a prerequisite to seeing his child. Instead, he continued his drug use, failed to seek out steady employment, and returned to jail several times. As the juvenile court noted, "nothing ha[d] changed" since DCS first removed Yancy.

Continuation of the parent-child relationship would also diminish the child's opportunity for an early integration into a safe, stable, and permanent environment. Yancy's foster mother testified that he has a deep bond with her family. While in her custody, Yancy had found routine in school and at home that led to improvement in his behavior and emotional development. She also testified that her family hoped to adopt Yancy.

10

5. Failure to Manifest an Ability and Willingness to Assume Custody

Finally, the court found termination of Father's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*Id.* § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). As to the first prong, the petitioner may prove that a parent is either unable or unwilling to "assume legal and physical custody or financial responsibility for the child." *Id.* at 677.

Like the juvenile court, we conclude that the evidence is clear and convincing that Father is willing to assume custody of the child, but not able to do so. At trial, Father shared his love for Yancy and his desire to parent the child. But desire alone is insufficient. A parent must also demonstrate an ability to care for the child. Father did not. Even by the time of trial, Father acknowledged that he would not be able to immediately assume custody of Yancy. He instead needed time to "get back on [his] feet first."

The evidence is equally clear and convincing that placing Yancy in Father's custody would pose a risk of substantial harm to his psychological welfare. Returning children to the custody of a virtual stranger carries a risk of substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (reasoning that returning the child to a "virtual stranger" in light of his strong bond with his current caregivers would constitute substantial harm). Yancy was not yet two-years-old when he was removed from Father's custody. The child was six-years-old by the time of trial. In the interim, due either to his multiple incarcerations or the court's order that he should have no visitation, Father had extremely limited contact with his child.

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, termination of parental rights must also be in the child's best interests.

11

At the time the petition to terminate was filed against Father, Tennessee Code Annotated § 36-1-113(i) listed nine factors bearing on the best interest determination.[4] The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount [] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

After considering the statutory factors, the juvenile court concluded that the proven facts amounted to clear and convincing evidence that termination is in the child's best interest. We share that conclusion. The first two statutory factors consider the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the potential for lasting change. *Id*. § 36-1-113(i)(2). The court found that Father had not made "significant progress on addressing the reasons for removal." Despite "reasonable efforts" made by DCS to facilitate reunification, Father "rebuffed the case manager" and failed to adjust "so as to make [a] safe return . . . possible."

The next two statutory factors examine the parent's relationship with the child. The third factor looks at the consistency of visitation. *See id*. § 36-1-113(i)(3). The fourth addresses the quality of the parent's relationship with the child and whether it is "meaningful." *Id.* § 36-1-113(i)(4). The court found that Father did not attempt "to maintain regular visitation or other contact with the child" and that no "meaningful relationship" existed between the two. It also noted that the child had night terrors and asked his foster mother to not send him back to his biological parents.

The fifth factor considers the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The court found that "[r]emoval of the child from his [foster] home would . . . be detrimental." Both his foster mother and kindergarten teacher testified to the child's unique emotional and behavioral needs. While improving, the child still had "episodes of incontinence" and required ADHD medication. The court attributed the child's recent improvements to the "significant degree of structure and consistency in his life" while in foster care and found that the child "would not have this if returned to [Father]."

The sixth factor asks whether the parent or a person residing with the parent "ha[d] shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." *Id.* § 36-1-113(i)(6). The court mentioned an instance of such an event, but the court noted that it "occurred prior to the

---

[4] The Legislature amended the list of best interest factors in 2021. 2021 Tenn. Pub. Acts 509 (ch. 190).

child coming into custody and [was] accordingly not a factor." The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *Id.* § 36-1-113(i)(7). The court found that, while Father exhibited substance abuse issues in the past, "there was no testimony that presently [Father's] drug issues would prevent him from providing safe and stable care." So the court did not find this factor favored terminating Father's parental rights.

The eighth statutory factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision of the child." *Id.* § 36-1-113(i)(8). The court found that this factor did not weigh adversely against Father "due to the absence of current mental health information."

The ninth factor examines the parents' child support history. *Id.* § 36-1-113(i)(9). The court found that this factor weighed adversely against Father because he had not paid support for the child. Although the evidence preponderates against the finding that Father paid no child support, we agree that Father's one child support payment of fifty dollars weighs in favor of terminating his parental rights.

## III.

We affirm the termination of Father's parental rights. The record contains clear and convincing evidence to support seven statutory grounds for termination. We also conclude that terminating Father's parental rights was in the child's best interest.

s/ W. Neal McBrayer
W. NEAL MCBRAYER, JUDGE

13